```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

RAFIC SAADEH,

                                    Plaintiff,                    20-CV-01945 (PAE)(SN)

                 -against-
                                                                  OPINION & ORDER
MICHAEL KAGAN, et al.,

                                    Defendants.
-----------------------------------------------------------------X
```

**SARAH NETBURN, United States Magistrate Judge:**

The Court assumes the reader's familiarity with this action.

Plaintiff Rafic Saadeh moves this Court for sanctions against Defendants Michael Kagan ("Michael"), Joshua Kagan ("Joshua") and Joshua's lawyer, John Maggio for their conduct related to the dissipation of an Estate asset. Although the Court finds that Michael acted in a manner intended to prejudice Plaintiff, Michael did not materially violate a Court order and the ultimate harm to Plaintiff – the dissipation of the Estate asset – has been avoided. Accordingly, I find that sanctions are not warranted.

## BACKGROUND

### I.    Procedural Background

Plaintiff sued the Estate of Irving Kagan, among others, after Irving defaulted on a $130,000 loan. Upon Irving's death, the Surrogate's Court for the County of New York established the Estate and appointed Michael Kagan as its Administrator. SAC at ¶ 23. One of the Estate's principal assets is recovery in a lawsuit in the United Kingdom (the "UK Litigation"). Before his death, Irving was involved in an attorneys' fee dispute, with a value purportedly exceeding $500,000.

Throughout this action, Plaintiff has been concerned that the proceeds from the UK Litigation would not be fully recovered by the Estate. On October 1, 2021, Plaintiff notified the Court that he had recently learned that (1) the Estate had offered to settle the UK Litigation for $100,000 (a fraction of its alleged value) without the apparent authority vested in Michael, the Administrator,[1] and (2) other individuals, including Joshua and his wife, purported to be lenders to the UK Litigation with a "priority interest" in repayment over the Estate. ECF No. 117 at 2. Attorney Maggio responded that Joshua and others had agreed to fund the UK Litigation to allow it to proceed "provided that any money collected would first result in reimbursement to those who financed the UK attorneys in the litigation with the remainder passing through to the Estate." ECF No. 119 at 1. For his part, Michael responded that "[f]riends and family" helped fund the litigation even before Irving's death and apologized "for not disclosing these funding arrangements before now." ECF No. 120 at 1-2. Plaintiff moved for a preliminary injunction under Federal Rule of Civil Procedure 65. ECF No. 130.

While that motion was pending, Plaintiff filed an emergency application "to preserve the status quo with regard to any recovery in the Estate's litigation in the United Kingdom." ECF No. 165 at 1. Plaintiff requested an order restraining Michael and the Estate from disbursing any recovery from the UK Litigation and requiring Michael and the Estate to hold such funds pending further court action. Id. Plaintiff argued that "immediate temporary injunctive relief" was necessary because circumstances were "changing rapidly." Id. As relevant, Michael responded that Plaintiff had an interest only in the "residual or net funds" from the UK Litigation, and that other "third-party lenders" had a "secured interest in the proceeds of the litigation, memorialized by an appropriately drafted funding agreement to which the UK law

---

[1] Michael produced an order from the High Court of Justice, substituting Michael Kagan as Administrator for the Estate of Mr. Irving Kagan, as Respondent in the UK Litigation. ECF No. 120-1.

firm is a party." ECF No. 167 at 4. Joshua's response acknowledged that "the proceeds from the UK litigation are an Estate asset" but challenged the legal authority for an injunction. ECF No. 168 at 1. On February 9, 2022, the Court ordered Michael "to inform Plaintiff's counsel within one business day of any activity related to the Estate assets." ECF No. 171.

On Sunday, February 27, 2022, Plaintiff filed another emergency application seeking an immediate restraining order. ECF No. 185. Attached to the application was Michael's email from Friday, February 25, 2022, sent at 10:24 at night. ECF No. 185, Ex. 1. That email stated:

> I understand from the attorney in the UK that the other side and the law firm holding the money at issue have agreed to terms. I expect a court order approving the settlement in the next few days and the release of funds to the law firm's client account shortly thereafter.

Attorney Maggio was copied on Michael's email. Discovery would later reveal that Michael was aware of the settlement 36 hours before the email was sent and knew that the court order had already issued. Michael opposed Plaintiff's request on Monday, arguing for the first time that the "funds from the settlement do not belong to the estate," among other things. ECF No. 186 at 1.

On Tuesday, March 1, this Court issued a Temporary Restraining Order and recommended that the District Judge enter a preliminary injunction restraining certain Estate Assets. ECF No. 187, Report and Recommendation (the "TRO"), adopted at ECF No. 234. Specifically, this Court found that Plaintiff was entitled to a restraining notice over certain assets of the Estate under New York Civil Practice Law and Rules ("CPLR") § 5222 and recommended granting the injunction under Federal Rule of Civil Procedure 69. Id. at 5. Recognizing the lack of clarity about any "priority" funders to the UK Litigation, the Court's TRO restrained "any funds that are first held by the Estate" pending further order of the Court." Id. at 4. The TRO was explicit, stating "[f]or the avoidance of doubt, this means that any funds that pass through the Estate, even for purposes of later distribution and even to secured creditors, are deemed 'Estate

Assets' for purposes of this order." Id. Michael was ordered to deliver a copy of the TRO to UK counsel within 24 hours and to copy Plaintiff's counsel on that communication. Id. at 5.

The following day, Michael notified the Court that before his "ability to transmit" the TRO to UK counsel, he "received notification that the funds had been fully disbursed . . . ."[2] ECF No. 188. The Court's response was swift, immediately finding that under the circumstances of the pending applications, "the expeditious distribution of these funds suggests bad faith and grounds for sanctions." ECF No. 190 at 1. The Court authorized expedited document and deposition discovery related to the funding agreements and loan payments for the UK Litigation and the distribution of all settlement funds, including bank information and related communications. Id. at 2. The Court further ordered Joshua to deposit approximately $50,000 in a secured, interest-bearing escrow account within five days. Id.

On the heels of the Court's Order, Michael notified the Court that "all the third-party lenders" agreed to return their proceeds, amounting to $89,242.67 (inclusive of Joshua's distribution). ECF No. 191 at 1. The Court ordered counsel for the UK Litigation to hold such funds until further order. ECF No. 195. On March 7, Attorney Maggio confirmed that Joshua's distribution from the UK Litigation, amounting to $48,355.73, was being held in escrow, ECF No. 192, which the Court so-ordered, ECF No. 196.

## II.   Conduct Related to UK Litigation Funds

Discovery revealed that Michael, Joshua, and Attorney Maggio acted knowingly to dissipate the Estate Assets despite pending applications to restrain the same. On Thursday, February 24, at 10:55 a.m., Michael was advised that the UK Litigation was "resolved." ECF No. 206, Ex. 1 at 3. Michael would not notify Plaintiff's counsel of this development for 36 hours,

---

[2] This letter was entered on March 3, 2022, and Michael stated that he filed it at 5:24 p.m. on March 2, well after he had learned about the disbursements from UK counsel.

waiting until 10:24 p.m. Friday, February 25. ECF No. 185, Ex. 1. In his email, Michael told Plaintiff's counsel that he would be receiving a court order approving the settlement "in the next few days," and that the release of the funds would be "shortly thereafter." Id. In fact, however, that order had issued on February 24, ECF No. 206, Ex. 2, and UK counsel testified that he had notified Michael that the order had issued, ECF No. 206, Ex. 3. By Sunday, February 27, Michael was asking UK counsel for "expected timing of the wires." ECF No. 206, Ex. 1 at 3.

While opposing Plaintiff's request for a restraining order, Michael and Joshua were acting expeditiously to clear any hurdle to the distribution of the UK Litigation funds. On the same day that he filed his opposition with the Court, Michael emailed UK counsel to "expedite things on your end with . . . Maggio."[3] ECF No. 206, Ex. 7. Also on February 28, Joshua emailed a UK Litigation funder, letting him know that funding was imminent and that the funder should send wire instructions "within the next 2 days." ECF No. 206, Ex. 8.

On March 1, Michael emailed Joshua's wife Marni with the subject line "Getting paid f[ro]m the UK." ECF No. 206, Ex. 10. Michael wrote: "Money is in!" and asked Marni to "have John [Maggio] verify the IDs ASAP." Id. Marni forwarded Michael's email to Joshua one minute later. Id. That same day, Michael and UK counsel engaged in extensive discussions to finalize the disbursements. ECF No. 206, Ex. 11. At one point, Michael noted that they were waiting on "[o]ur lawyer" who "knows time is of the essence." Id. Attorney Maggio would provide the relevant documentation to Marni by 2:06 p.m. that day. ECF No. 216, Ex. 14. Later that day, Attorney Maggio submitted a letter on Condon Forsyth letterhead to UK counsel verifying Joshua's passport. ECF No. 206, Ex. 15.

---

[3] Michael testified that this email was intended for Marni, Joshua's wife. The intended recipient does not change Michael's guilty consciousness but underscores the role of Joshua and Attorney Maggio in this scheme.

As discussed above, the Court issued the TRO on March 1. Attorney Maggio forwarded the TRO to Joshua. He described the restraining order as applying to "any funds that pass through the Estate." ECF No. 206, Ex. 22. Attorney Maggio did not direct Joshua to take any action with respect to any disbursements he might receive from the UK Litigation, despite having facilitated such payments a few hours earlier by providing UK counsel with Joshua's passport. In the early morning hours of March 2, UK counsel notified Michael that the funds were being sent. ECF No. 206, Ex. 23. Michael did not notify the Court of this until after business hours, and so his letter was not entered on the docket until 9:30 a.m. the next day.

## DISCUSSION

Saadeh moves for sanctions pursuant to the Court's inherent power against Michael, Joshua, and Attorney Maggio for acting in bad faith and vexatiously multiplying the cost of litigation. Alternatively, Saadeh moves for a finding of contempt. Saadeh seeks all attorney's fees and costs incurred from the discovery and motion practice stemming from this misconduct as well as fees incurred from filing the preliminary injunction. Finally, Saadeh seeks case-dispositive sanctions and additional sanctions as may be necessary to prevent future wrongdoing.

Although Plaintiff moves for sanctions under the Court's inherent authority, "[i]nherent power is constrained: it requires 'caution' and notice before use; and it is a last resort for when an express authority is not 'up to the task.'" In re Gravel, 6 F.4th 503, 516 (2d Cir. 2021) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991)). Accordingly, before considering whether to act under its inherent authority, the Court considers whether a more explicit source of its authority applies.

I.     Rule 16

Federal Rule of Civil Procedure 16(f) provides a court authority to sanction a party or its attorney who "fails to obey . . . a pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Plaintiff identifies the Court's February 9 Order and the TRO as orders that Michael violated. The February 9 Order required Michael "to inform Plaintiff's counsel within *one business day* of any activity related to the Estate assets." ECF No. 171 (emphasis added). Michael received an email from UK counsel about the settlement on Thursday, February 24 at 10:55 a.m., and notified Plaintiff's counsel on Friday, February 25 at 10:24 p.m.

There is little doubt in the Court's mind that Michael's 36-hour delay was intended to, and did, facilitate the rapid disbursement of settlement funds. Michael's testimony that he felt ill on February 25, slept all day, and only remembered late Friday night to notify Plaintiff's counsel is not credible given the focus on this issue at this time. The Court's directive, however, was to notify Plaintiff's counsel "within one business day" and, technically, a notification on Friday for information received on Thursday, satisfies the letter of that order, even if not its spirit.

The TRO directed Michael "to deliver this order to counsel for the U.K. litigation within *24 hours*, with copy to Plaintiff's counsel." ECF No. 187. The TRO was posted on ECF at 7:00 p.m. on March 1. Michael sent the TRO to UK counsel at 4:31 p.m. the following day but failed to copy Plaintiff's counsel on that transmission as ordered. Delivery in 21.5 hours is delivery "within 24 hours." Of course, by 4:31 p.m. in New York, business had closed in the U.K. The payments had already been sent earlier that business day. As a result, the failure to copy Plaintiff's counsel did not prejudice Plaintiff, whereas the delayed notice may have.

Finally, the TRO enjoined the dissipation of any Estate Assets until further order of the Court. The Court defined Estate Assets as "any funds that pass through the Estate, even for

7

purposes of later distribution and even to secured creditors." The record reveals that in the hours before the TRO issued, Michael, Joshua, and Attorney Maggio were working expeditiously to provide UK counsel with the information needed to disburse the funds. See ECF No. 206, Ex. 10 ("have John [Maggio] verify the IDs ASAP"); Ex. 11 ("Please have everything 'teed-up' and ready to go") (Attorney Maggio "knows time is of the essence"). When the TRO issued, Attorney Maggio timely sent it to his client but did not direct Joshua to take any action.

While the Court finds that Michael took every advantage up to the line of the Court's authority, his technical violation (by not copying Plaintiff's counsel on his communication with UK counsel) was immaterial, and he was otherwise compliant. And, because the Court had not issued any clear directive to Joshua and Attorney Maggio, they also did not violate a court order. Accordingly, the Court finds that sanctions under Rule 16 are not appropriate.

**II.     28 U.S.C. § 1927**

The Court also considers whether sanctions under § 1927 are appropriate. Where an attorney "multiplies the proceedings in any case unreasonably and vexatiously," the Court may require the attorney to satisfy personally the excess costs, including attorney's fees. 28 U.S.C. § 1927. Section 1927 sanctions may be imposed only "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." Johnson v. Univ. of Rochester Med. Ctr., 642 F.3d 121, 125 (2d Cir. 2011) (citation omitted).

The Court finds that Attorney Maggio's conduct in expeditiously facilitating the disbursement of the funds with knowledge of the pending requests for emergency relief was inconsistent with his duty of candor to the Court. That duty obliged Attorney Maggio to notify the Court that the distribution of funds was imminent so that the Court could act on the pending

motions. See Model Rules of Pro. Conduct r. 3.3 ("a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision"). Arguably, had Attorney Maggio notified the Court on February 28 or even earlier on March 1 that the distribution of funds was imminent, the Court would have acted more quickly, the funds would not have been disbursed, and additional litigation would not have been necessitated, including Plaintiff's motion. The Court regrets Attorney Maggio's decision to keep this information to himself, for the advantage of his client and to the detriment of the Court's decision-making process. But on this record, the Court cannot conclude that his conduct qualifies clearly as vexatious to justify imposing costs.

### III. Inherent Power

Thus, the Court turns to its inherent power. "The Court has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 79 (2d Cir. 2000) (internal quotations and citations omitted). Determining whether sanctions are appropriate is "one of the most difficult and unenviable tasks for a court." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999).

Under the Court's inherent sanctioning powers, "[a] court may not impose sanctions . . . unless the party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Hawley v. Mphasis Corp., 302 F.R.D. 37, 46 (S.D.N.Y. 2014) (quoting Cretella v. Liriano, 370 F. App'x 157, 159 (2d Cir. 2010) (citation omitted)). "The district court must find bad faith in order to impose such sanctions and bad faith must be shown by 'clear evidence' that the actions in question are taken for 'harassment or delay or . . . other improper purposes.'" Cretella, 370

F.3d at 158 (quoting <u>United States v. Int'l Bhd. of Teamsters</u>, 948 F.2d 1338, 1345 (2d Cir. 1991)); <u>Wolters Kluwer Fin. Servs., Inc. v. Scivantage</u>, 564 F.3d 110, 114 (2d Cir. 2009). Bad faith requires a showing "both" that "the challenged actions are entirely without color" and that they were taken "for reasons of harassment or delay or for other improper purposes." <u>U.S. v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.</u>, 948 F.2d 1338, 1345 (2d Cir. 1991) (cleaned-up). When conduct meets these criteria, courts can impose attorney's fees against an attorney or their client, in what has become known as the "bad faith exception" to the American rule against fee shifting. <u>Chambers</u>, 501 U.S. at 45.

The Court is left with the firm view that Michael acted at the edge of the Court's rulings for an improper purpose: to allow the UK Litigation settlement funds to be distributed before the Court could restrain them. Had he promptly and more candidly advised Plaintiff's counsel on Thursday, February 24 that the UK court had approved the settlement and the funds would be distributed upon the furnishment of certain documents, Plaintiff's counsel would have filed his emergency application on Thursday or Friday and the Court would have issued its TRO before the funds were distributed the following Wednesday, March 2.

The harm this conduct caused, however, has been remedied because the funds have been clawed back and are now held in attorney escrow accounts.[4] <u>See</u> ECF Nos. 195 & 196. Although the Court's inherent power is intended as a back-stop against misconduct that is not otherwise prohibited, it must be exercised judiciously. <u>See</u> <u>Chambers</u>, 501 U.S. at 44 (inherent power should be exercised "with restraint and discretion"). Despite the serious concern the Court has with Michael's conduct specifically, and the conduct of Michael, Joshua, and Attorney Maggio in aid of interfering with Estate Assets intended to satisfy the Estate's debts, the Court cannot

---

[4] The Court recognizes that Plaintiff's counsel expended fees conducting discovery after the claw-back. This expense cannot be considered *harm* to Plaintiff *caused by* Defendants' actions.

conclude that their actions were "entirely without color." Accordingly, sanctions are not warranted.

## CONCLUSION

Plaintiff's motion for sanctions against Michael, Joshua, and John Maggio is DENIED. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 204.

**SO ORDERED.**

DATED: February 10, 2023
New York, New York

_____
SARAH NETBURN
United States Magistrate Judge