UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAFIC SAADEH,

                                        Plaintiff,                     20 Civ. 1945 (PAE) (SN)

                    -v-                                                         ORDER

MICHAEL KAGAN, ET AL.,

                                        Defendants.

---

PAUL A. ENGELMAYER, District Judge:

This order resolves whether punitive damages will be an available remedy at the

upcoming jury trial in this case, scheduled to begin November 13, 2023.  In a letter motion,

plaintiff Rafic Saadeh argues that there is a legal and factual basis on which such damages could

be awarded against defendants Michael and Joshua Kagan.  Dkt. 288.  In separate letters,

defendants argue the contrary.  *See* Dkts. 289 (Joshua), 291 (Michael).  For the reasons that

follow, the Court precludes Saadeh from pursuing punitive damages against either defendant.[1]

---

[1] Saadeh renews his argument that a motion *in limine* is not an appropriate vehicle with which to
litigate the availability of punitive damages, on the ground that resolution of a "claim's validity"
can be made only at summary judgment.  *See* Dkt. 288 at 1.  The Court has previously rejected
that argument.  *See* Dkt. 286.  Punitive damages are a monetary remedy, not a liability claim, *see*
*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 517 F. Supp. 2d 662, 666
(S.D.N.Y. 2007), and courts may address the availability of such damages on a summary
judgment motion or on a motion *in limine*, the authority to resolve which reflects a district
court's "inherent authority to manage the course of trials," *Luce v. United States*, 469 U.S. 38, 41
n.4 (1984); *see, e.g., Thomas v. West*, No. 14 Civ. 4459 (LTS), 2019 WL 1206696, at *1–2
(S.D.N.Y. Mar. 14, 2019) (deciding question of punitive damages on a motion *in limine*);
*Benzinger v. Lukoil Pan Americas, LLC*, No. 16 Civ. 8533 (PAE), 2021 WL 431169, at *8
(S.D.N.Y. Feb. 8, 2021) (same).  The Court here invited letter briefing on the availability of
punitive damages to assure that the parties have clarity on that point before trial and can measure
their preparation and advocacy accordingly.  *See* Dkt. 286.

I.      **Discussion**

"The circumstances in which New York law allows punitive damages are 'singularly

rare.'" *Martiny v. Introcaso-Allison*, No. 17 Civ. 9559 (SN), 2019 WL 4593613, at *4 (S.D.N.Y.

Sept. 23, 2019) (quoting *Cresswell v. Prudential-Bache Sec., Inc.*, No. 83 Civ. 2099 (RWS),

1986 WL 14921, at *2 (S.D.N.Y. Dec. 23, 1986)).  With respect to claims sounding in fraud—

and here, Saadeh pursues claims of fraudulent conveyance against both Joshua and Michael—a

plaintiff, to obtain punitive damages, must establish circumstances beyond those of an

"'ordinary' fraud and deceit case." *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961).  The

defendant's conduct must "evince[] a high degree of moral turpitude and . . . wanton

dishonesty[.]" *Id.*[2]  The plaintiff must adduce evidence of extraordinary misconduct worthy of

punishment and deterrence, and not merely conduct causing compensable injury.  *See Ross v.*

*Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007).  As the evidence adduced differs as between

Joshua and Michael, the Court considers the evidence as to the defendants in turn.

## A. Punitive Damages as to Joshua Kagan

Saadeh argues that punitive damages are available against Joshua because he personally

benefited (receiving $35,000) from the loan that Saadeh made to Joshua's father, Irving Kagan,

assisted the allegedly insolvent Irving in procuring other loans from family and friends, and

benefitted from such loans.  Dkt. 288 at 2–6.  Joshua counters that Saadeh has not identified

---

[2] Several courts have held that the plaintiff must also show that the fraud itself was "aimed at the public generally," so as to make punitive damages non-recoverable in a case concerning a "private" wrong. *See Levi v. Commonwealth Land Title Ins. Co.*, No. 09 Civ. 9018 (SHS), 2013 WL 5708402, at *10 (S.D.N.Y. Oct. 21, 2023) (collecting cases).  Because Saadeh's evidence would not meet the threshold for punitive damages regardless, the Court does not rely on that limitation here.

evidence of the wanton misconduct necessary to support punitive damages. Dkt. 289 at 4. Joshua is correct.

In resolving this motion, the Court assumes that all genuine factual disputes would be resolved in Saadeh's favor. But the limited evidence Saadeh musters that is relevant to his fraudulent conveyance claim against Joshua does not evince the level of moral turpitude necessary for an award of punitive damages. Saadeh's evidence is that Irving and his sons had worked collectively as "Kagan Consultants"; that, by the time Irving sought a loan from Saadeh, that entity was out of funds; that Joshua sought financial support from Irving; and that Irving provided such support to Joshua, including $35,000 traceable to the loan Irving received from Saadeh. Dkt. 288 at 2 (citing evidence); *see, e.g., id.*, Ex. B (text messages showing Joshua appearing to ask Irving for money to cover expenses). Saadeh also adduces evidence that, although Joshua may not have known the identity of the "good friend" from whom Irving was seeking a loan, he knew that Irving was making a loan request. Dkt. 288 at 2 ("Joshua was plainly aware of the loan itself, with the intention to use the funds at least in part to satisfy Joshua's need for money."). Saadeh also adduces evidence that Joshua participated in procuring other loans for Irving. *See id.*, Ex. C at 32 (Joshua "did most of [the arranging] for [Irving]" though did not specifically remember "reaching out"); *id.* at 136–37; Dkt. 288, Ex. G. In one instance, Joshua emailed his mother's first cousin seeking $30,000, while indicating that Irving would not want him to make this request, whereas in fact, Irving and Joshua's wife had assisted in ghostwriting that request. *See* Dkt. 288, Ex. G.

Saadeh's evidence, if credited, could support his fraudulent conveyance claim against Joshua, which is based on Irving's having procured the loan from Saadeh on allegedly false pretenses and then provided $35,000 of the proceeds to Joshua. But the assembled evidence is

3

insufficient for a jury to find Joshua's conduct outside the heartland of fraud cases, let alone to have been "gross, wanton, [and to reflect the] high degree of moral culpability required to justify an award of punitive damages." *V.J.V. Transp. Corp. v. Santiago*, 570 N.Y.S.2d 138, 139 (2d Dep't 1991). Saadeh labels "intentional" Joshua's conduct in helping Irving procure the loan from him on false pretenses, Dkt. 288 at 4, but intentional conduct does not equate to gross or wanton conduct. *See, e.g.*, *Key Bank of N.Y. v. Diamond*, 611 N.Y.S.2d 382, 383 (4th Dep't 1994) (knowing pledge of worthless stock certificates as security for $24,500 business loan was fraudulent but did not evince necessary high degree of moral culpability (internal quotation marks omitted)); *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 924 N.Y.S.2d 376, 377 (1st Dep't 2011) (punitive damages will only lie where "defendant's wrongdoing is not 'simply intentional'" but rather "circumstances of aggravation or outrage" (quoting *Ross*, 8 N.Y.3d at 489)). Joshua's having assisted Irving in procuring loans from others does not fortify this showing. The only act of ostensible dishonesty that Saadeh develops as to these efforts entailed Joshua's telling a cousin what amounts to a white lie—that Irving would not have wanted him to ask to borrow money whereas Irving, behind the scenes, orchestrated the request for the loan. *See* Dkt. 288, Ex. G. Without more, that conduct does not qualify as wanton or gross. *See Key Bank of N.Y.*, 611 N.Y.S.2d at 383; *see also Cherotti v. Exphand, Inc.*, No. 20 Civ. 11102 (SLC), 2023 WL 5526625, at *16 (S.D.N.Y. Aug. 28, 2023) (plaintiff's allegations that defendant defrauded five other individuals did not render conduct so far-reaching and egregious as to justify punitive damages); *Living the Dream Films, Inc. v. Aloris Ent., LLC*, No. 20 Civ. 6982 (LGS) (JLC), 2021 WL 4342700, at *9 (S.D.N.Y. Sept. 24, 2021), *report and recommendation adopted*, No. 20 Civ. 6982 (LGS), 2021 WL 5822233 (S.D.N.Y. Dec. 7, 2021) (evidence that

4

purported fraud "may have affected several victims" did not demonstrate level of moral turpitude necessary to support punitive damages).

As a final basis for punitive damages, Saadeh cites ostensible misconduct by Joshua and Michael in connection with a litigation in the United Kingdom brought by Irving's Estate. *See* Dkt. 288 at 7 (citing *In re Kovler*, 253 B.R. 592, 604–05 (Bankr. S.D.N.Y. 2000)). That litigation arose from a patent infringement case settled in the U.K. in October 2018, apparently for $6.5 million. *See* Dkt. 117, Ex. B (email from Michael). Irving, an attorney, had participated as a legal consultant in that case, pursuant to a contract under which he would be paid a monthly retainer and a "success fee." *Id.* However, Irving's client reportedly reneged on that agreement. At the time Saadeh became a judgment creditor of Irving's Estate, the Estate had retained U.K. counsel and was prosecuting an action to vindicate Irving's contract rights. *See id.* Michael had told Saadeh that that litigation could be worth as much as $570,000 to the Estate. *See* Dkt. 117, Ex. A. The Estate's claim for Irving's consultancy fees is—apart from a house in foreclosure in Pennsylvania that is "under water" financially—the Estate's only asset. *See id.* at 3. Ultimately, the Estate settled its claim against Irving's former client for $100,000. *See* Dkt. 190. The Estate was obliged, however, to pay, off the top, the lenders who had helped finance the Estate's litigation against the client; these included, among others, Joshua. *See* Dkt. 132, Ex. 4 (list of third-party lenders funding U.K. litigation). By that time, Saadeh had obtained a default judgment against the Estate for $178,265.02; alerted to the settlement, Judge Netburn had issued a Report recommending that, pending judicial review of the proper disposition of the $100,000, a restraining order issue to bar the Estate from disbursing any portion of the U.K. settlement. *See* Dkt. 190 at 1. Saadeh notes, however, that the Estate, which was represented by Michael as its administrator, paid out some $50,000 to Joshua in his capacity as a litigation funder. Had these

5

funds remained in the Estate, Saadeh notes, they could have been used to assist the Estate to pay the default judgment against it. Dkts. 115, 117, 192, 242; *see* Dkt. 192.

As events developed, this Court, per Judge Netburn, acted to cause Joshua's recoveries—and those of the other litigation funders—to be frozen, so as potentially to be accessible to Irving's Estate and its creditors, were it eventually determined that the Estate improperly disbursed these funds. *See* Dkts. 190 (order compelling Joshua to place money in escrow), 191 (letter from Michael reporting that funds disbursed to other third-party lenders would be clawed back). And in this litigation, Saadeh is seeking sanctions arising out of these events, *see* Dkts. 204, 242, an application the Court resolves, and denies, in a separate decision today. Relevant to this motion, Saadeh argues that the Estate's election to repay its litigation funders including Joshua supports a punitive damages award against Joshua, in his capacity as recipient of this payment, and Michael, in his capacity as the Estate administrator who approved these disbursements. *See* Dkt. 288 at 7.

For two independent reasons, this incident does not support a punitive damages award against Joshua.

First, Saadeh's attempt to inject the subject of the U.K. litigation, and within it Joshua's litigation funding role and later repayment, into this fraudulent conveyance lawsuit would be unsustainable under Rule 403. It would introduce otherwise extraneous topics including Irving's work in the patent litigation, the funding mechanics of the Estate's lawsuit against Irving's former client, the Estate's decision to settle its claim against the former client, and the Estate's decision to pay the lawsuit's funders off the top of the settlement. Saadeh's accusations notwithstanding, it is far from clear that there was any impropriety in the financing of the litigation, the decision to settle it, the terms of its settlement, or the decision by the Estate that it

could not retain the full settlement sum but was obliged first to pay the persons who funded the litigation that resulted in the settlement. Before a jury could find any misconduct by Joshua in connection with the return of the funds he had fronted, the jury would almost certainly be required to hear testimony from the Estate's attorney, and Joshua and Michael, about the circumstances that gave rise to the settlement; what the alternative settlement terms, if any, were; absent settlement, the strength of Irving's estate's claim and its likelihood of recovery at trial; and the legal and practical justifications for paying Estate creditors off the top. This exercise would give rise to the trial-within-a-trial that Rule 403 classically disfavors. *See, e.g., United States v. Aboumoussallem*, 726 F.2d 906, 911–12 (2d Cir. 1984) (upholding exclusion of evidence to avoid "trial within a trial"); *Doe v. Lima*, No. 14 Civ. 2953 (PAE), 2020 WL 728813, at *8 (S.D.N.Y. Feb. 13, 2020) (excluding evidence where admission would "invite the classic 'trial within a trial' that Rule 403 disfavors"); *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 358–59 (S.D.N.Y. 2014) (excluding evidence where it "would create a risk of unfair prejudice, confusion, and delay" by diverting the jury's attention from the "singular event" at issue (citations omitted)). The dive into the U.K. litigation necessary to permit a reliable resolution of Saadeh's claim of impropriety there by the counseled Joshua risks doubling the duration of this trial, injecting delay, and distracting the jury from the central issue on Saadeh's claim against Joshua, involving his receipt of $35,000 from Irving following Saadeh's loan to Irving. Saadeh's bid for punitive damages from Joshua thus founders because the evidence on which it rests cannot be received consistent with Rule 403.[3]

---

[3] This Court and Judge Netburn were dismayed that the Estate had appeared to hurry the disbursement to avoid its possibly being restrained, requiring Judge Netburn's successful intercession. Such gave rise to Saadeh's pending motion for sanctions. *See* Dkts. 190, 242 (Report of Judge Netburn, recommending denial of sanctions motion notwithstanding that

Second, even if evidence of Joshua's asserted misconduct in receiving the return of his litigation funding incident to the U.K. settlement were compatible with Rule 403, that action, without more, falls short of warranting punitive damages. *Compare Perrone v. Amato*, No. 09 Civ. 316 (AKT), 2010 WL 11629624, at *4 (E.D.N.Y. Aug. 30, 2010) ("the act of removing property from the reach of a creditor is not misconduct so gross and wanton as to justify such an award"), *with In re Kovler*, 253 B.R. at 604–05 (punitive damages available based on "other misconduct," which included fabrication of evidence, perjury, and subornation of false or improper notarizations by notaries public).

Saadeh thus has not adduced admissible evidence upon which a jury could find gross, wanton disregard for civil obligations on Joshua's part, sufficient to support punitive damages. The Court thus will not permit Saadeh's claim for punitive damages against Joshua to go to the jury and will exclude all evidence whose sole basis for admission concerns punitive damages.

## B.      Punitive Damages as to Michael Kagan

Saadeh points to the following as a basis on which to find wanton misconduct by Michael: (1) Michael assisted Irving in securing the loan from Saadeh, under the allegedly false premise that Michael needed a bridge loan, *see* Dkt. 288, Ex. D; (2) in the ensuing years, during which Irving did not repay the loan, Michael engaged in repeated exchanges with Saadeh, in which he allegedly induced Saadeh "to defer in collecting on the loan by referring . . . to

---

"[d]iscovery revealed that Michael, Joshua, and Attorney Maggio acted knowingly to dissipate the Estate Assets despite pending applications to restrain the same"). Rule 403 would clearly present a barrier to evidence of this conduct, too, if offered as a basis for a punitive damages award. Because this conduct arises from the same disbursements by the Estate, consideration whether the disbursement was proper would implicate the same extraneous evidence reviewed above. And to determine whether the disbursement's timing was premature, the jury would also have to hear evidence about the litigation directives of Judge Netburn, and how the timing of disbursements comported with these.

transactions that were closing imminently," while knowing that Saadeh's finances were precarious, Dkt. 288 at 3; *Id.*, Ex. E; (3) Michael received extensive financial support from Irving, including support deriving from the loan from Saadeh, and joined Irving and Joshua in soliciting loans to Irving from others, including a family friend, Laura Engel, who loaned Irving money earmarked for her daughter's wedding but was not repaid; and (4) Michael's allegedly wrongful role in settling the U.K. litigation, as administrator of Irving's estate, Dkt. 288 at 7. Michael counters Saadeh's allegations factually, asserting that the original loan from Saadeh was not obtained on a false premise, that he did not lie to induce Saadeh to defer collection but instead diligently sought to raise money to repay Saadeh, and that Saadeh misleadingly presents the Kagans' financial dealings. Alternatively, he argues, even if Saadeh's factual allegations were credited, as a matter of law, they fall short of supporting an award of punitive damages. Dkt. 291 at 2–7.

Michael's final point is decisive. The Court assumes that the jury would resolve the above factual disputes in favor of Saadeh. Even so assuming, the evidence as to Michael does not remove this case from the heartland of fraud cases, including intentional ones, or establish the wanton misconduct required to support a punitive damages award. Fraud inherently involves deceit. A long line of cases has held that knowing misrepresentations made to secure a loan or put off repayment are insufficient, without more, to support punitive damages in a fraud case. *See, e.g., Key Bank of N.Y.*, 611 N.Y.S.2d at 383; *Cherotti*, 2023 WL 5526625, at *16 (punitive damages unavailable despite evidence that defendant's conduct was "knowingly false and misleading and part of an ongoing scheme to induce unsuspecting people . . . to fund the lifestyle of [defendant] and his wife" (internal quotation marks omitted)); *Int'l Christian Broad., Inc. v. Koper*, 928 F. Supp. 2d 559, 563 (E.D.N.Y. 2013) (lies to defendant's grandmother concerning

false military service to secure a $22,000 loan insufficient to support punitive damages); *see also Hoeffner*, 924 N.Y.S.2d at 377 (fraudulent misrepresentations made to induce a party to enter into an employment contract not enough for punitive damages). That is so even where the alleged fraudulent representations were made to multiple people, *see, e.g., Cherotti*, 2023 WL 5526625, at *16, or to family or friends, *see, e.g., Koper*, 928 F. Supp. 2d at 563 (defrauded grandmother); *Cherotti*, 2023 WL 5526625, at *16 (defrauded close friend and mentee). Saadeh's evidence with respect to Michael does not remove this case from this body of authority.

Michael's alleged misconduct in connection with the U.K. litigation also does not support punitive damages. The analysis above in connection with Joshua substantially applies as well to Michael, including insofar as the litigation over the U.K. settlement and the disbursements under it would give rise to a trial-within-a-trial, impermissible under Rule 403. Saadeh's offer of proof as to Michael differs slightly, in that Michael was the administrator of Irving's Estate not only at the time of the settlement agreement, Dkt. 117, but at the time the disbursements to the litigation funders (including Joshua) were made, without advance notice to Judge Netburn. Dkt. 185, Ex. 1; Dkt. 188. Saadeh assails this conduct; Michael defends it as lacking bad faith, Dkt. 193 at 13–14. He further notes that—as a result of Judge Netburn's intervention—"all the third-party lenders" have since agreed to return the funds disbursed to them. Dkt. 191 at 1.

Even assuming the disbursal of these funds could be found by a jury to have breached a court order, *see* Dkt. 242 at 8,[4] Saadeh's bid for punitive damages fails. Exploration of this

---

[4] Judge Netburn's Report recommends denial of Saadeh's motion for sanctions arising from the disbursement of funds from the U.K. litigation settlement. She finds technical compliance with her orders. However, she faults Michael and the Estate's attorney for strategically taking actions tending to undermine the effect of these orders by enabling quick disbursement of Estate funds before notice had been received by Saadeh's counsel. *See* Dkt. 242 at 8. In a decision issued today, the Court adopts Judge Netburn's Report recommending denial of sanctions.

episode—including the decision to settle, the decision to disburse litigation funders off the top,
and the decision not to alert Judge Netburn in advance of those disbursements—would, again,
inject into this trial a complex episode well afield from the underlying conduct involving Irving's
loan to Saadeh. The exploration of these events would necessitate lengthy testimony from
additional witnesses, including lawyers, and prolong the trial considerably, with attendant risks
of confusion. To the extent Michael could claim to have relied on counsel, this would add
complexity. Rule 403 squarely precludes this area. And even if it did not, Michael's conduct,
even if found to be an attempt to shield the Estate's assets from a judgment-creditor, would not
rise to the level of meriting punitive damages. *See Perrone*, 2010 WL 11629624, at *4; *Marine
Midland Bank v. Murkoff*, 508 N.Y.S.2d 17, 24 (2d Dep't 1986) ("[T]he act of removing
property from the reach of a creditor is not misconduct so 'gross and wanton' as to justify such
an award." (quoting *James v. Powell*, 19 N.Y.2d 249, 260 (1967))).

Accordingly, Saadeh has not adduced admissible evidence sufficient to support an award
of punitive damages against Michael. The Court will exclude any evidence offered for the sole
purposes of supporting a claim for such damages.

## CONCLUSION

For the foregoing reasons, this Court precludes Saadeh from pursuing punitive damages
at the upcoming trial, and will exclude all evidence offered solely for the purposes of obtaining
such damages.

11

12

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 17, 2023
        New York, New York

12