UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                       :
RAFIC SAADEH,                                          :
                                    Plaintiff,         :
                                                       :
                  -v-                                  :          20 Civ. 1945 (PAE) (SN)
                                                       :
MICHAEL KAGAN, ET AL.,                                 :          OPINION & ORDER
                                                       :
                                    Defendants.        :
                                                       :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        This decision involves an application for sanctions.  In this litigation, plaintiff Rafic

Saadeh seeks to collect on a $130,000 loan that he made to the late Irving Kagan; Saadeh sues

Kagan's Estate ("Estate") and Kagan's sons, Michael Kagan ("Michael") and Joshua Kagan

("Joshua"), for fraudulent conveyances.  Salient to the present motion, Saadeh obtained a default

judgment against the Estate, making him a judgment-creditor thereof.  *See* Dkt. 74.  He moved

for relief to prevent the defendants from dissipating the assets of the Estate, including to the

extent that the Estate obtained funds by settling a litigation in the United Kingdom in which it

sought to recover an unpaid consulting fee allegedly owed Irving, and which Saadeh assumed

would be become Estate property in its entirety.  *See* Dkt. 187 at 3–5.  On March 1, 2022, the

Hon. Sarah Netburn, United States Magistrate Judge, recommended, pursuant to Rule 69 of the

Federal Rules of Civil Procedure, that this Court issue an order restraining all assets of the

Estate, and imposed a temporary restraining order to that effect while counsel responded to her

recommendation.  *See* Dkt. 187 ("Report").  However, Michael, administrator of the Estate, did

not timely deliver this order to the Estate's U.K. counsel as directed, leading settlement funds

temporarily to be disbursed to third-party funders of the litigation, including defendant Joshua,

1

whom U.K. counsel had determined were entitled to payment from the Estate. *See* Dkts. 188 (letter from Michael), 132, Ex. 4 (list of third-party lenders in U.K litigation). Thanks to Judge Netburn's energetic intervention, those disbursements were clawed back and are being held in escrow. *See* Dkt. 190.

On March 3, 2022, Judge Netburn ordered discovery related to this episode. Thereafter, on April 25, 2022, Saadeh moved for sanctions against Joshua, Michael, and Joshua's attorney in this litigation, John Maggio, Esq. In a Report and Recommendation issued February 10, 2023, Judge Netburn recommended denying the motion. Dkt. 242 ("Report"). On February 24, 2023, Saadeh moved for reconsideration solely as to the denial of the attorney's fees he incurred for discovery about the settlement of the U.K. litigation. On August 7, 2023, Judge Netburn denied that motion. Dkt. 279.

Saadeh now objects to Judge Netburn's recommendations, both initially and on reconsideration, to not impose sanctions. Dkt. 287. For the reasons that follow, the Court adopts Judge Netburn's recommendations in full.

I.    **Factual and Procedural Background**

A.    **Procedural History**

The following summary captures the limited facts necessary for an assessment of the issues presented.

On March 4, 2020, Saadeh filed suit in this Court against the Estate of Irving Kagan and Irving's two sons, Michael and Joshua, after Irving defaulted on a $130,000 loan Saadeh had made to Irving. Dkt. 4. Upon Irving's death, the Surrogate's Court in Manhattan appointed Michael as administrator of Irving's Estate. Dkt. 95 ¶ 23. On September 27, 2021, this Court, based on Saadeh's undisputed allegation of the unpaid loan, entered a default judgment in favor

of Saadeh against Irving's Estate in the amount of $178,265.02, with interest.[1]  Dkt. 115.  Saadeh is thus a judgment-creditor of the Estate.

One of Irving's Estate's few potential assets has been a claim it has made in a lawsuit in the United Kingdom ("the U.K. Litigation") for unpaid fees allegedly owed to Irving for legal consultancy work on a patent litigation.  The Estate claimed more than $500,000 for such work. Dkt. 242 at 1.  On October 1, 2021, Saadeh notified the Court that he had learned that the Estate had offered to settle the U.K. Litigation for $100,000.  Dkt. 117 at 2.  Saadeh also reported that funders of the litigation, including Joshua and his wife, asserted a "priority interest" in the settlement funds received by the Estate.  *Id.*

On November 24, 2021, Saadeh moved in this Court for a preliminary injunction to prohibit defendants from selling or encumbering any Estate assets or settling any of the Estate's claims.  Dkt. 130.  On February 9, 2022, while that motion was pending, the Court, per Judge Netburn, ordered Michael "to inform Plaintiff's counsel within one business day of any activity related to the Estate assets."  Dkt. 171.

On Friday, February 25, 2022, at 10:24 p.m., Saadeh received notice from Michael that a settlement in the U.K. Litigation would formalize "in the next few days" and that funds would be disbursed "to the law firm's client account shortly thereafter."  Dkt. 185, Ex. 1.  On Sunday, February 27, 2022, Saadeh filed an application for a temporary restraining order ("TRO") to restrain the Estate from disbursing settlement funds.  Dkt. 185.  The next day, Michael wrote the Court, opposing the TRO.  Dkt. 186.

---

[1] After the Court granted in part and denied in part Michael's and Joshua's motions to dismiss, on February 23, 2022, Saadeh moved for partial summary judgment on breach of contract and promissory estoppel claims against Michael; on April 28, 2022, defendants made cross motions for summary judgment.  On March 31, 2023, this Court granted summary judgment in Saadeh's favor on his promissory estoppel claim against Michael and denied the balance of the motions.

On Tuesday, March 1, 2022, at 7 p.m. Eastern Standard Time ("EST"), Judge Netburn issued a Report and Recommendation that this Court grant the TRO. She ordered Michael to deliver the Report to counsel in the U.K. Litigation within 24 hours, copying Saadeh's counsel. Dkt. 187, *adopted at* Dkt. 234. Pending this Court's review of the Report, Judge Netburn ordered that the TRO take effect immediately. Judge Netburn's Report reasoned that Saadeh was entitled to a restraining notice over "Estate Assets" under New York Civil Practice Law and Rules ("CPLR") § 5222 and recommended granting the injunction under Federal Rule of Civil Procedure 69. Dkt. 187 at 5. To assure clarity, the TRO defined "Estate Assets" as "any funds that pass through the Estate, even for purposes of later distribution and even to secured creditors." *Id.* at 4.

On March 2, 2022, Michael, by letter, notified the Court that before he had been able to transmit the TRO to U.K. counsel, he had received notification that the settlement funds had been disbursed. Dkt. 188. Michael's letter was not entered on the docket until Thursday, March 3, 2022. *Id.*; *see* Dkt. 242 at 6.

Judge Netburn thereupon authorized expedited discovery of Michael and Joshua on topics relating to these events, including production of communications, funding agreements, and bank statements related to the U.K. Litigation. Dkt. 190 at 2. Judge Netburn reasoned that the Estate's "expeditious distribution of these funds suggest[ed] bad faith and grounds for sanctions." *Id.* at 1. In a status conference the same day, Michael, in an apparent attempt to distance himself from the disbursement to the litigation funders, likened his role in the Estate's distribution of funds to "watching a storm offshore" and stated that the funds had not been "rushed in the dead of night." Dkt. 193 at 13. Judge Netburn ordered Joshua to deposit the approximately $50,000 that had been disbursed to him in a secured, interest-bearing escrow

account within five days. Dkt. 190 at 2. Michael later notified the Court that "all the third-party lenders" had agreed to return their proceeds, which totaled $89,242.67. Dkt. 191 at 1. On March 7, 2022, Joshua's attorney, Maggio, confirmed that the sum Joshua had received from the U.K. Litigation settlement, which totaled $48,355.73, had been placed in escrow. Dkt. 192.

Discovery revealed that, on Thursday, February 24, 2022, at 10:55 a.m. EST, the Estate's counsel in the U.K. Litigation, Mark Edmonds, had notified Michael that the final impediment to a full settlement had been cleared. Dkt. 206, Ex. 1 at 3. On Friday, February 25, 2022, at 9:47 a.m. EST, the U.K. court order approving the settlement was transmitted to Edmonds. Dkt. 206, Ex. 2. It was not, however, until February 25, 2022, at 10:24 p.m. EST, that Michael wrote to Saadeh's counsel that the order would issue "in the next few days." Dkt. 185, Ex. 1. Michael thus waited approximately 36 hours after Edmonds advised him of the impending settlement to notify Saadeh's counsel of impending disbursement of these Estate assets.

Discovery also revealed Michael, Joshua, and Maggio's expeditious attempts to disburse the settlement funds after Saadeh filed his application to restrain them. On Sunday, February 27, 2022, the same day Saadeh filed his request for an expedited TRO, Michael emailed Edmonds, stating that "by Tuesday" he would update Edmonds with the amounts to be paid to each individual lender. Dkt. 206, Ex. 1 at 3. On Monday, February 28, 2022, while opposing Saadeh's TRO application, Dkt. 186, Michael and Joshua provided updated due diligence to Edmonds to enable him to disburse those funds. In an email intended for Joshua's wife, Marni,[2] Michael wrote that "[m]oney may be in [Edmond's] account tomorrow" and asked Marni to "please expedite things on your end with [U.K. Lender] and Maggio." Dkt. 206, Ex. 7. Joshua

---

[2] This email was inadvertently sent to Edmonds. Dkt. 206, Ex. 4 at 225–26.

also emailed a U.K. Litigation lender, notifying him that funding was imminent and that the lender should send wire instructions "within the next 2 days." Dkt. 206, Ex. 8.

On March 1, 2022, before Judge Netburn issued the TRO, Michael emailed Marni: "Money is in!" and asked her to "have John [Maggio] verify the IDs ASAP." Dkt. 206, Ex. 10. The same day, Michael and Edmonds had extensive discussions to finalize the disbursements. Dkt. 206, Ex. 11.  At one point, Michael noted that they were waiting on "[o]ur lawyer" who "knows time is of the essence." *Id.* Maggio provided the relevant documentation to Marni by 2:06 p.m. and, soon thereafter, submitted a letter to U.K. counsel verifying Joshua's passport. Dkt. 206, Ex. 15; Dkt. 216, Ex. 14.

Discovery did not reveal that Joshua's attorney, Maggio, had directed Joshua to take any action with respect to any disbursements.  As to Michael, however, it revealed that, in the early morning hours of March 2, 2022—the day after Judge Netburn's TRO (copying Saadeh's counsel) had issued that required defendants to inform U.K. counsel of the Order within 24 hours—U.K. counsel had notified Michael that the funds were being sent.  Dkt. 206, Ex. 23. Michael, however, did not notify this Court of this fact until after business hours that day. Accordingly, his letter was not entered on the docket until the following morning, March 3, 2022, at 9:30 a.m.  Dkt. 188.

**B.     Saadeh's Motion For Sanctions**

On April 25, 2022, Saadeh moved for sanctions against Michael, Joshua, and Maggio. As authority, he cited the Court's inherent power to sanction the "abusive litigation practices" of "defendants[] and their counsel" and their "contempt" for the Court's orders. Dkt. 204 at 17.

The sanctionable conduct, Saadeh alleged, began with Michael's failure to comply with the February 9, 2022 Order directing him to notify Saadeh's counsel within one day of activity

affecting Estate assets. *Id.* at 17–18. Saadeh also termed Michael's February 25, 2022 correspondence misleading, in that it stated that (1) Michael expected a court order would approve the settlement "in the next few days," whereas in fact such an order had issued 12 hours earlier; and (2) funds would be distributed to "to the law firm's client account," but left out that Michael planned to disburse funds to the third party litigation funders, including Joshua. *Id.* at 17. Saadeh also faulted Michael, Joshua, and Maggio for attempting to circumvent his request for a TRO while it was pending. *Id.* at 19. He further alleged that Michael had breached the TRO when he failed to copy Saadeh's counsel when he transmitted the TRO to U.K. counsel. *Id.* at 20.

Saadeh also termed egregious Michael, Joshua, and Maggio's sluggish response to the TRO, in that they did not promptly notify the Court of the Estate's disbursements, in contrast to their "frenetic" activity beforehand. *Id.* at 20–21. Michael, Saadeh noted, had seen an email from Edmonds about the funds transfer at 7:30 or 8 a.m. on the day (March 2, 2022) after the TRO issued; spoken to his counsel at 11:30 a.m. that day about the TRO; but waited until 4:31 p.m. to notify U.K. counsel of the TRO. *Id.* at 21–22. And Maggio, Saadeh claimed, wrongly told Joshua the TRO "only" applied to Estate Assets, and thus aided the transfer of disbursements to Joshua and Marni. *Id.* at 22. In sum, Saadeh argued, Michael, Joshua, and Maggio, in bad faith, had subverted the TRO, diverted Estate assets, and frustrated his attempts to recover on his judgment via the UK settlement funds. *Id.* As an alternative basis for relief, Saadeh moved for civil contempt. *Id.* at 23. He claimed violations of three court orders: (1) Michael's failure to inform Saadeh's counsel within one business day of activity related to the Estate assets, as required by the February 9 Order; (2) Michael's failure to copy Saadeh's

counsel when transmitting the TRO to U.K. counsel; and (3) Michael, Joshua, and Maggio's failure to pause the distribution of estate funds to the litigation funders. *Id.* at 23–24.

Joshua and Maggio opposed the motion for sanctions. They argued that the TRO's objective of maintaining the status quo with respect to settlement funds had been achieved, in that all the disbursed funds had been returned and were being held in escrow in accordance with Judge Netburn's March 3, 2022 Order. Dkt. 218 at 3. Indeed, they noted, this had been so by March 7, 2022, yet Saadeh nonetheless chose thereafter to pursue discovery into these events, which included depositions of Michael and Joshua on March 25, 2022, and of Edmonds on April 11, 2022. *Id.* at 3.

Michael also opposed the motion. He argued that that his conduct before the TRO complied with Court orders and stated his disbursement of funds to Estate creditors, including his brother, reflected a valid desire "to be done with the UK litigation," which was creating "significant stress in the family." Dkt. 225 at 4. And, as to the period after the TRO issued, Michael stated, he had originally believed the TRO (1) was not binding until it was adopted by this Court and (2) did not apply to all settlement funds. *Id.* at 6–8. Michael acknowledged that, after his conference with Judge Netburn on March 3, 3022, he had appreciated that he "should have erred on the side of caution," but that he had immediately instructed the Estate's U.K. attorney to cease executing the transfers and took action to reclaim them, while sending a letter of apology to the Court. *Id.* at 8–9.

In her February 10, 2023 Report, Judge Netburn recommended denying Saadeh's motion for sanctions, finding such unwarranted under Federal Rule of Civil Procedure 16, 28 U.S.C. § 1927, and the Court's inherent power. Dkt. 242.

As to Rule 16, which empowers courts to impose sanctions for violations of pretrial court orders, Judge Netburn found that Michael had "technically" complied with the Court's February 9 Order because he had notified Saadeh of the impending settlement within one business day—albeit after business hours—of learning that a settlement had been reached. *Id.* at 7. As for Michael's failure to copy Saadeh's counsel when transmitting the TRO to U.K. counsel, that, Judge Netburn concluded, had been "immaterial," because by then the settlement funds had already been disbursed. *Id.* at 8. As to 28 U.S.C. § 1927, Judge Netburn found sanctions unwarranted because Maggio's conduct did not qualify "clearly as vexatious," even though he had likely breached his duty of candor with the Court. *Id.* at 8–9. And, Judge Netburn concluded, exercise of the Court's inherent authority against Michael was unwarranted, because Michael's conduct, though "at the edge" of an improper purpose, in the end had not harmed Saadeh and was not "entirely without color." *Id.* at 10–11.

**C.     Motion for Reconsideration**

On February 24, 2023, Saadeh moved for reconsideration. He noted that Judge Netburn had ordered discovery and "invited" his sanctions motion and that he should be compensated by the defense for the costs incurred in the ensuing discovery, which he contended yielded proof of defendants' bad faith. Dkt. 244 at 7–9. He objected to the Report's finding of "no harm/no foul" insofar as the disbursed funds had been promptly returned. *Id.* at 11. He noted that this would not have been so but for Judge Netburn's intercession, and that he had incurred costs pursuing such relief. *Id.*

In her Report on the motion for reconsideration, Judge Netburn recommended denying that motion, finding the circumstances not to present a "manifest injustice." Dkt. 279 at 2–3. She noted that Saadeh, not the Court, chose to conduct multiple depositions after the disbursed

funds had been placed in escrow. *Id.* at 3. The Court did not find manifest injustice in declining to cover costs for one party that engages in "litigation tactics" that it came to regret. *Id.* at 3.

## II. Discussion

The Court reviews a Magistrate Judge's Report and Recommendation on a nondispositive matter for clear error and may set aside any part of the order that is contrary to law. Fed. R. Civ. P. 72(a). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *MacNamara v. City of New York*, 249 F.R.D. 70, 77 (S.D.N.Y. 2008) (internal quotations omitted). Consequently, "parties seeking to overturn the Magistrate's discovery rulings bear a heavy burden." *Citicorp v. Interbank Card Ass'n,* 87 F.R.D. 43, 46 (S.D.N.Y.1980) (internal quotations omitted); *see also Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 177 (S.D.N.Y. 2008) ("[I]t is extremely difficult to justify alteration of the magistrate judge's nondispositive actions by the district judge." (quoting 12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 3069, at 350–51 (2d ed. 1997)).

In her careful Report, Judge Netburn found that sanctions were unwarranted under (1) Rule 16 because defendants' violation of the Court's TRO was immaterial, (2) 28 U.S.C. § 1927 because Maggio's conduct was not clearly vexatious, and (3) the Court's inherent power because defendants' conduct was not "entirely without color." Dkt. 242 at 8–11. Saadeh's objections do not establish that any of these conclusions was clearly erroneous or contrary to law.

Saadeh's first three objections are brief and largely conclusory. He argues that Judge Netburn should have (1) found that Michael "blatantly lied" about the initial disbursement of U.K. funds, (2) drawn a negative inference that defendants violated the TRO from the lack of communications between defendants, Maggio, and Edmonds after the TRO was issued, and (3)

imposed sanctions against Maggio for violating his duty of candor to the Court. Dkt. 287 at 16. Saadeh has not shown clear error on any of these points.

First, Saadeh objects to the fact that Judge Netburn did not denounce as knowingly false two statements by Michael at the March 3 status conference after the TRO issued. Dkt. 287 at 8– 9. There, Michael denied that the disbursement of funds had been "rushed in the dead of night" and described his role as "like watching a storm offshore." Dkt. 193 at 13. The Report did not explicitly critique these statements. The Report instead set out a thoughtful account of the events and conduct at issue, and, although finding near-violations of her orders, found Michael to have technically complied with them. *See* Dkt. 242 at 2–6. That assessment was fair and reasonable. Judge Netburn was not under any obligation to go beyond that to critique Michael's specific statements. And, to the extent that the two statements by Michael might be read to distance himself from the disbursement decisions or to cast them as made after prolonged reflection, Judge Netburn's overall assessment makes clear that she did not accept that portrait, even while finding Michael's conduct technically compliant so as not to merit sanctions. Judge Netburn's manner of evaluating defendants' compliance was not error, let alone clear error.

Second, Saadeh objects that Judge Netburn did not impose sanctions for failure to timely communicate with Saadeh's counsel after the TRO issued. *See* Dkt. 287 at 16. Federal Rule of Civil Procedure 16(f) gives a court authority to sanction a party or its attorney who "fails to obey . . . a pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Judge Netburn's Report found a breach of one pretrial order—the TRO—in one respect: Michael's failure to copy Saadeh's counsel when transmitting it to Edmonds.[3] Dkt. 242 at 8. But Judge Netburn found this breach immaterial

---

[3] Saadeh does not challenge Judge Netburn's finding of compliance with the February 25 Order. The Report was clearly correct that Michael satisfied the "letter" of that Order by informing Saadeh of the impending settlement within "one business day" of becoming aware of it.

because the settlement funds had already been disbursed by the time Michael transmitted the

TRO. *Id.* Judge Netburn's decisions not to draw a broader adverse inference against defendants,

or to impose sanctions based on this particular lapse, were within her discretion, and not clearly

erroneous or contrary to law. To the extent Saadeh implies that other breaches of the TRO

occurred, he has not established them. *See Valenti v. Penn Mut. Life Ins. Co.*, 850 F. Supp. 2d

445, 453 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013).

Third, Saadeh suggests that the Report erred in not finding Maggio's conduct "clearly

vexatious," justifying sanctions under § 1927. *See* Dkt. 287 at 15–16. But based on the record,

Maggio ultimately did make his client aware of the TRO and advised Joshua to safeguard the

funds disbursed to him, as he did. Dkt. 216 ¶¶ 21–22. Viewing Maggio's conduct holistically,

Judge Netburn did not err, let alone clearly, in finding his conduct, though worthy of criticism,

less than "clearly vexatious."

Saadeh's most fundamental objection faults Judge Netburn for focusing on the effect of

the alleged violator's conduct rather than the violators' intent. Dkt. 287 at 5 (citing *Int'l Techs.*

*Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361 (2d Cir. 2021)). In effect, Saadeh argues that Judge

Netburn gave undue weight to the fact that the disbursed funds were ultimately reclaimed and

restrained, pending the outcome of this litigation. Dkt. 287 at 5. There was no error of this

nature in the Report. As both the Second Circuit's decision in *International Technologies* and

the Report recognize, for a court to impose sanctions under its inherent power, it must find that

the conduct in question was done in bad faith *and* was entirely without color. *See Int'l. Techs.*

*Mktg., Inc.*, 991 F.3d at 368; Dkt. 242 at 10–11. Here, Judge Netburn did not so find. Rather, in

declining to recommend imposition of sanctions under inherent powers, Judge Netburn explicitly

found that, although defendants' actions were "at the edge" of an improper purpose, they were

not entirely without color. *See* Dkt. 242 at 10–11. Tellingly, Saadeh does not dispute that point. He does not, for example, contend that defendants lacked a colorable basis to treat as not "Estate Assets" the settlement funds that the Estate was obliged to pay off the top to its funders. Nor does he dispute that Michael's notice of the impending settlement was consistent with "the letter" of the February 25 Order. *See* Dkt. 242 at 7 ("[Michael] satisfied the letter of that order, if not the spirit."). Under these circumstances, as Judge Netburn found, defendants' conduct, while arguably ignoble, was not "entirely" without color. The Report thus reasonably found the standard for such sanctions not to have been met.

Saadeh's claim that the Report erred in noting the absence of adverse effects from the allegedly sanctionable conduct is also incorrect. Relevant here, in *International Technologies*, the Second Circuit noted that, as a matter of law, adverse effects stemming from sanctionable conduct are not a prerequisite to the imposition of sanctions under a court's inherent powers. *See Int'l. Techs. Mktg., Inc.*, 991 F.3d at 369. The Report, however, did not base its recommendation against sanctions on the absence of adverse effects alone. Rather, Judge Netburn emphasized that defendants' conduct had been not "entirely without color." Dkt. 242 at 10–11. That aligned with the Circuit's discussion in *International Technologies*, in which it noted that courts have long made clear "that the only prerequisites to a district court imposing monetary sanctions under its inherent power is that a party advanced a colorless claim and did so for improper reasons." 991 F.3d at 369. Nothing in *International Technologies* bars a court from taking into account the effects of the sanctionable conduct, provided that such is not the "primary" focus of the analysis. *Id.* at 368. Judge Netburn's Report did not primarily base its recommendation against sanctions on the absence of material harm caused by defendants' conduct. And this Court, in adopting the

Report, does not do so either.  The Court instead predominantly declines to impose sanctions because defendants' conduct, while well short of noble, was not entirely without color.

## CONCLUSION

For the foregoing reasons, the Court denies Saadeh's motions for sanctions and for reconsideration.  The Court respectfully directs the Clerk to mail a copy of this decision to Michael Kagan at the address on file.

Trial in this case remains scheduled for November 13, 2023.  A final pretrial conference is scheduled for Friday, November 3, 2023 at 11:00 a.m., to be held in person at the Thurgood Marshall United States Courthouse in Courtroom 1305.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: October 17, 2023
     New York, New York